EDWARD J. CLEARY v. DAKOTA PACKING COMPANY.[1]

January 12, 1898.

Nos. 10,849—(254).

Personal Injury — "Hog-Scraper" Machine—Negligence—Change of Signal—Contributory Negligence—Evidence.

Evidence considered, and *held*, that it establishes the plaintiff's contributory negligence as a matter of law.

Appeal by defendant from an order of the district court for Dakota county, Crosby, J., denying its motion for judgment notwithstanding the verdict or for a new trial, after a verdict for the plaintiff for $2,000. Reversed.

*Morton Barrows*, for appellant.

An employee is bound to take notice of conditions open to his daily observation. Anderson v. Minnesota, 39 Minn. 523. If he knows the exact character and condition of appliances furnished by the master and understands, or by the exercise of common observation should understand, the risks to which he is exposed by their use, he will be deemed voluntarily to have assumed such risks. Scharenbroich v. St. Cloud, 59 Minn. 116. A master is not liable for an injury to a servant when the danger is as obvious to the servant as to the master. Smith v. Tromanhauser, 63 Minn. 98.

*P. H. O'Keefe* and *C. W. Ney*, for respondent.

Where there is uncertainty as to the existence of contributory negligence, whether because there is a conflict in the testimony, or because, the facts being undisputed, fair-minded men might hon-

[1] Reported in 73 N. W. 717, 1099.

estly draw different conclusions, the question is one for the jury. Abbett v. Chicago, 30 Minn. 482; Leonard v. Minneapolis, 63 Minn. 489; Pruke v. South, 68 Minn. 305; Barbo v. Bassett, 35 Minn. 485. Under the view of the circumstances most favorable to this defendant, the question of negligence was for the jury. Anderson v. Northern, 42 Minn. 424; Erickson v. St. Paul, 41 Minn. 500; Birnberg v. Schwab, 55 Minn. 495; Sobieski v. St. Paul, 41 Minn. 169; Shumway v. Walworth, 98 Mich. 411; Carlson v. Northwestern, 63 Minn. 428.

START, C. J.

Action to recover damages for personal injuries received by the plaintiff by reason of defendant's alleged negligence. Verdict for the plaintiff for $2,000, and defendant appeals from an order denying its motion for judgment notwithstanding the verdict and its alternative motion for a new trial.

The plaintiff, at the time he was injured, was employed by the defendant as an engineer in its pork-packing establishment. His duties were to look after the running and repair of the machinery, and, whenever and however the fact that it was obstructed or in need of repair was brought to his notice, it was his duty to put it in order. The killing, scalding and curing department of the defendant's business, in which 25 to 35 men were employed, was in charge of a foreman, John Duncan, who had the supervision and entire control of the work and men in this department.

The evidence tends to show that it was the duty of the plaintiff, whenever directed by Duncan to remove obstructions from the machinery or to repair it, to do so; but the manner of executing the order was left to plaintiff's judgment.

In this killing department, during all the time plaintiff was so in the employ of the defendant, some eleven months in all, there was in operation a machine known as a "scraper," for removing the bristles from the hogs. The evidence tends to show that this scraper, from one cause or another, was started and stopped very frequently in working hours, and that it was frequently obstructed by a hog being caught and held therein, when the machine would be stopped, and the hog dislodged by the men from the outside of

the machine, if it could be so done; if not, then the hog would be dislodged by men going inside of the machine.

The evidence further tends to show that the signal adopted and used for the safety and convenience of the men in stopping and starting the machine during all the time of the plaintiff's, service, except the last five weeks thereof, was two or three sharp raps with a hog hook upon an iron rod running along the side of the machine, which could be heard anywhere on the floor where the machine was operated; that, five weeks before the accident, this signal was changed by direction of the foreman, Duncan, and the man whose duty it was to start the machine was directed to do so as soon as he saw the man whose duty it was to unhook the hogs jump down from the scraping bench, without waiting for the former signal; that neither of the signals was promulgated by a rule of the defendant; and, further, that at the time of the accident the scraper was stopped to remove a hog which had become caught therein, and Duncan and another man were trying to dislodge it from the outside, when the plaintiff came up, and was directed by Duncan to knock the hog off. With Duncan's knowledge he started to go inside of the machine, to enable him to do so. Just as he was in the act of going inside, he placed his foot on a sprocket wheel, which was propelled by an endless chain, when the machine was started, without any signal or warning being given to him, catching his foot between the sprocket and chain, and injuring his ankle.

The plaintiff testified that, when he went into the machine, he had no knowledge of any change in the signals, and relied for his safety on the raps on the iron rod being given before starting the machine, and, if they had been given, he could have saved himself from injury. He also testified that he depended upon the foreman seeing that the machine was not started without notice to him.

The three principal questions raised on this appeal are: (1) Was the foreman guilty of negligence in the premises which was the proximate cause of the plaintiff's injury? (2) If so, was his negligence that of the defendant or of a fellow servant? (3) Was the plaintiff guilty of negligence contributing to his injury?

As the last question must be answered in the affirmative, it is unnecessary to discuss or pass upon the others. In considering

this last question, there are certain admitted facts to be kept in mind, for in the light of them the conduct of the plaintiff must be judged.

He was not an ordinary laborer, without any knowledge or appreciation of the risks and dangers of the situation which confronted him, who was bound either promptly to obey all orders, and go where he was sent, and do as he was told, without question or reply, or to look for bread elsewhere. On the contrary, he was a man of experience, an engineer and the superintendent of machinery in this packing establishment. While he was bound to repair the machinery or remove obstructions therefrom when directed by the foreman, yet the manner of doing it was left to him exclusively. The foreman had no authority to direct him in this respect, and, furthermore, it was his duty, upon his own motion and without any direction from any one, to repair the machinery whenever he discovered or learned that it needed his attention. This necessarily implied the authority to do, and direct to be done, with reference to the machinery, whatever was reasonably necessary to enable him with safety to himself and assistants to repair the machinery or remove obstructions therefrom.

He was about this machine every day when it was running during the time he was in the service of the defendant, before his injury. The principal part of his duties was on the floor where the scraper was operated when hogs were being killed, and he was frequently called upon to repair it. It was a frequent occurrence for hogs to be caught therein. He testified on this point as follows:

"I have seen it happen two or three times in one day; then run along three or four weeks, and possibly not catch again. There is nothing sure about it."

He had previously testified, in effect, that the time of stopping the machine from all causes varied, depending on the kind of hogs; that it was liable to stop every ten or twenty-five minutes, and at least once an hour in the course of a half day. He learned of the original signals only by observation, and, with any care on his part, he ought to have observed and learned of the change of signals during the five weeks he was about the machine after the change

was made, even conceding the claim of his counsel that the change related only to starting the scraper when a hog was caught. It was not always necessary to go inside of the scraper when a hog was caught.

Again, he was not ordered to go inside of the scraper by the foreman. The latter directed him to knock the hog off, but only knew that he was going inside for that purpose when he saw him go. The plaintiff took no precautions as to his safety, notified no one that he was going inside, and gave no directions to the man at the lever, who stopped or started the machine, and who was at the other end of the machine from the foreman, and could not be seen by him. It required only the push of the lever to start the machine.

Now, what was done by this engineer and superintendent of this machinery, who knew all about it, and its risks and dangers, who had had the most ample opportunity for observing and knowing the customary manner of operating it, and the signals in use, and how he did conduct himself? Let his own story, as told on his cross-examination, be the answer:

"Q. When you would go inside the machine for the purpose of putting on these chains on the wheels, or for the purpose of removing an obstruction, such as occurred when you were injured,— in other words, when you were called in the neighborhood of these sprocket wheels,—wasn't it your custom to step on them in stepping down in? A. Yes, sir. Q. You knew, then, perfectly, the location of the sprocket wheels? A. I never paid very much attention; just went in there. Q. But you knew the sprocket wheel was there? A. Yes; I knew the sprocket wheel was there. Q. You also knew, did you not, that, if the machine started while you were standing there, you would be injured? A. Yes, sir. Q. How much of a sound would it give,—how loud a sound,—the ordinary striking of that bar as a signal, how far away could it be heard? Would it carry better than a man's voice? A. Much better; a man could hear that sound from one end of the floor to the other. Q. Even if the machine was running? A. Yes, sir. Q. At the time you were injured, did you hear any rap on the rod? A. I did not. Q. You would have heard it if it had been given? A. Yes; could not help but hear it."

Upon being recalled, he further testified thus:

"Q. From the position you were in at the time your foot was caught there, if a signal had been given by striking the rod, how

long would it have taken you to have got out of the position you were in at that time? A. I don't think it would have taken me an instant. I was prepared for anything of that kind. * * * Q. About how long was your foot resting on that sprocket wheel? A. Not very long. I was just stepping in. Q. What you would call an instant or longer? A. It might have been a second or two."

Our conclusion is that but one reasonable inference can be drawn from this evidence when considered in connection with the admitted facts in this case, and that is that the plaintiff was guilty of contributory negligence in the premises, and cannot legally or equitably ask the defendant to indemnify him for injuries resulting from his own carelessness.

The order appealed from must be reversed, and case remanded, with directions to the district court to grant the defendant's motion for judgment, notwithstanding the verdict. So ordered.

On Motion for Reargument.
February 3, 1898.

START, C. J.

Ordered, that the application for a reargument in this case be, and it is hereby, denied. Ordered, further, that the order heretofore made herein, directing judgment absolute for the defendant, be, and it is hereby, modified so as to read as follows: "Ordered, that the order denying the defendant's motion for a new trial be, and it is hereby, reversed, and a new trial granted."